**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DAVID VAUGHN,     )
            )
     Plaintiff,   )  Civil Action No. 11-82 Erie
            )
   v.       )
            )
MICHAEL J. ASTRUE,    )
Commissioner of Social Security,  )
            )
     Defendant.  )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

## I.   INTRODUCTION

  David Vaughn ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying his claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.* Plaintiff filed his application on June 16, 2008 alleging disability since September 25, 2007 due to degenerative disc disease, osteoarthritis of the cervical spine, and osteoarthritis of the shoulders (AR 101-102; 118).[1] His application was denied and he requested and was granted an administrative hearing before an administrative law judge ("ALJ") (AR 88-93).

  Following a hearing held on October 22, 2009 (AR 26-69), the ALJ concluded, in a written decision dated November 3, 2009 that Plaintiff was not entitled to a period of disability or DIB under the Act (AR12-20). Plaintiff's request for review by the Appeals Council was denied (AR 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). Plaintiff filed his complaint challenging the ALJ's decision, and presently pending before the Court are the parties' cross-motions for summary judgment. For the following reasons, both

---

[1] References to the administrative record [ECF No. 5], will be designated by the citation "(AR ___)".

1

motions will be denied and the matter will be remanded to the Commissioner for further proceedings.

## II.    BACKGROUND

Plaintiff was 48 years old on the date of the ALJ's decision and has a high school education (AR 19; 125).  He has past relevant work experience as an assembler and contractor (AR 119).  Plaintiff claims disability based on his alleged mental and physical impairments.

*Medical History*

*A.  Physical impairments*

The medical records reveal that Plaintiff had several left-shoulder surgeries, including a full replacement on January 14, 2005, and a reversion on January 26, 2006 (AR 281; 297-298; 557-559).  Plaintiff has also been treated by Robert Bazylak, M.D. for complaints of *inter alia*, chest pain (AR 357).  His diagnostic studies have yielded normal results (AR 358-359; 364-365; 469).

Plaintiff began treatment with James Macielak, M.D. on August 24, 2007 for evaluation of his cervical spine upon referral by Vincent Paczkoskie, M.D. (AR 351-352).  Plaintiff complained of pain in his neck, shoulders, and spine, and tingling in his extremities (AR 351).  Plaintiff's spine had mild tenderness and he was limited in side bending, right greater than left (AR 351).  There was a limited range of motion of Plaintiff's left shoulder, but his strength was otherwise normal (AR 351).  Conservative treatment was recommended (AR 351-352).

Plaintiff underwent physical therapy from August 28, 2007 to October 5, 2007 (AR 239-242).  He reported that while his symptoms persisted, his pain was less intense (AR 239).  His therapist reported that Plaintiff's pain decreased and his range of motion increased (AR 239).  On August 29, 2007, an MRI of Plaintiff's cervical spine revealed only minimal spinal stenosis at C5-6 and C6-7, and an MRI of his thoracic spine was normal (AR 337-338).

Plaintiff returned to Dr. Macielak on October 8, 2007 and complained of increased pain, and Dr. Macielak found Plaintiff's forced Spurling's test was positive for pain radiating into the upper extremities (AR 349).

Plaintiff was seen by D & R Pain Management for injection therapy on October 18, 2007 (AR 400-401).  He complained of severe cervical pain, bilateral shoulder pain and headaches (AR 400).  Physical examination revealed diffuse cervical tenderness and suboccipital tenderness (AR 400).  He was diagnosed with degenerative disc disease of the cervical spine and herniated cervical disc syndrome, and a cervical epidural was administered (AR 400).  On November 1, 2007, Plaintiff reported 50% improvement in his symptoms and he received another injection (AR 398).  On November 8, 2007, Plaintiff exhibited good range of motion with minimal cervical tenderness, and injection therapy was administered (AR 395).

Plaintiff was seen by Vincent Paczkoskie, M.D. on March 12, 2008 for left shoulder pain (AR 279).  Plaintiff stated that he felt a sharp pain the previous week after pulling and lifting (AR 279).  Dr. Paczkoskie found his surgical wound to be well healed, his deltoid was functional, there was gross weakness to belly press and lift off, and he had mild discomfort on external rotation (AR 279).  X-rays revealed a well-seated total shoulder replacement (AR 279).  Dr. Paczkoskie formed an impression of probable left subscapularis re-tear and ordered diagnostic studies (AR 279).  A left shoulder arthrogram dated March 13, 2008 revealed a rotator cuff tear (AR 336).

Plaintiff returned to Dr. Macielak on March 27, 2008 and reported that injection therapy had provided significant pain relief for two and one-half months, reporting only "minimal" pain during that time period (AR 348).  Plaintiff stated that his neck pain, headaches and upper extremity pain had returned, especially in the trapezius bilaterally (AR 348).  Physical examination revealed limited side bending of Plaintiff's neck, and decreased range of motion of the left shoulder (AR 348).  There were no strength deficits of the upper extremities (AR 348).  Dr. Macielak recommended that he undergo shoulder surgery first followed by cervical surgery (AR 348).

Plaintiff was seen by Dr. Bazylak on April 15, 2008, who reported that his subscapulais had deteriorated and scared and that he had limited mobility in his left shoulder  (AR 355).  On April 17, 2008, Plaintiff had surgery to repair his left shoulder performed by Joseph Iannotti, M.D. (AR 587-588).  Dr. Iannotti reported that Plaintiff had "very good" pain control

3

postoperatively (AR 587). By April 30, 2008 Plaintiff had only "modest" pain and his deltoid was functioning well (AR 583). On May 27, 2008, Dr. Iannotti noted that Plaintiff's repair was intact and he was to avoid heavier lifting until approved for physical therapy (AR 579).

Plaintiff returned to D & R Pain Management on June 17, 2008 and began a second series of cervical injections (AR 393). Plaintiff's cervical range of motion had decreased, and it was noted that his MRI showed marked degenerative changes throughout the cervical area (AR 393). A cervical epidural was administered (AR 393).

On July 22, 2008, Plaintiff reported no relief from the previous injection, and continued to complain of cervical pain (AR 391). Cervical tenderness and marked suboccipital tenderness was noted (AR 391). Plaintiff received a cervical epidural injection and a left occipital nerve block (AR 391). When Plaintiff returned on August 5, 2008, he reported that the nerve block had "helped quite a bit" and that he had minimal discomfort in his neck and shoulders (AR 388). Injection therapy had not, however, alleviated his severe headaches, and he reported some dizziness as well (AR 388). Plaintiff had minimal tenderness in the cervical area and his range of motion had improved (AR 388). There was no tenderness in the suboccipital area (AR 388). He was diagnosed with herniated cervical disc syndrome, headaches, etiology unknown, and possible hypertension (AR 388). Injection therapy was not administered due to Plaintiff's elevated blood pressure and vertigo symptoms (AR 388).

Plaintiff complained of persistent headaches when seen by Dr. Bazylak on August 6, 2008 (AR 473). His neck was tender on physical examination, and he was diagnosed with headaches and cervical spondylosis (AR 473). A CT scan of Plaintiff's head dated August 11, 2008 was reported as normal (AR 497).

When seen by Dr. Bazylak on August 19, 2008, Plaintiff complained of chest pain, shortness of breath and headaches (AR 472). It was noted that Plaintiff was "disabled because of shoulder pain" (AR 472).

On September 18, 2008, Mary Ellen Wyszomierski, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could occasionally lift ten pounds, frequently carry ten pounds, stand and/or walk for a total of six

4

hours in an 8-hour workday, sit for about six hours in an 8-hour workday, and was limited in his upper extremities from performing forceful pushing and pulling activities (AR 425). She further found Plaintiff could occasionally climb, balance, stoop, kneel, and crouch, but never crawl, and that he was limited in reaching in all directions (AR 426-427). She noted that Plaintiff's self-described daily activities were significantly limited and she concluded that they were "somewhat consistent" with the medical evidence (AR 430). She concluded, however, that Plaintiff would "recover sufficiently prior to 4/17/09" (AR 430).

An MRI of Plaintiff's cervical spine dated January 19, 2009 showed no significant change in the small central disc protrusion at the C6-7 level as compared to the August 2007 study (AR 488). There was also no significant change from the disc bulge and central canal stenosis seen at the C5-6 level (AR 488). There was straightening of the cervical alignment with mild reversal of cervical lordosis at the C5 level (AR 488).

On January 29, 2009, Plaintiff was seen by Dr. Paczkoskie for evaluation of his left shoulder (AR 499). Plaintiff reported weakness and pain with overhead activities (AR 499). Dr. Paczkoskie found decreased range of motion of Plaintiff's cervical spine and trapezial tenderness with lateral bending (AR 499). He also found some weakness on belly press, as well as on abduction and external rotation (AR 499). He found no gross instability and his deltoid was functional (AR 499). Dr. Paczkoskie formed an impression of "painful left total shoulder" and degenerative disc disease of the cervical spine (AR 499). He reported that Plaintiff was "obviously very disabled" from these conditions and could not return to his contractor job (AR 499). He recommended retraining "in a more light to sedentary duty status" (AR 499).

Plaintiff continued to report neck pain to Dr. Macielak in February and March 2009 (AR 516-519). On March 17, 2009, Dr. Bazylak found Plaintiff had cervical spine tenderness and left sided upper extremity weakness (AR 472). Dr. Bazylak diagnosed Plaintiff with cervical degenerative disc disease with radiculopathy (AR 472). On March 27, 2009, Plaintiff underwent a cervical discectomy and fusion surgery 505-510).

On April 9, 2009, Dr. Macielak reported that Plaintiff was doing well and had no significant pain or spasm, and that his range of motion was "quite good" (AR 504). By May 12,

2009, Plaintiff reported that he had full range of motion in both upper extremities and normal strength (AR 503). Dr. Macielak advised Plaintiff he could engage in physical activities if he avoided exerting himself (AR 503).

When seen by Dr. Macielak on June 25, 2009, Plaintiff reported increased neck pain and daily headaches (AR 502). Dr. Macielak noted Plaintiff's "sudden deterioration," and physical examination revealed a "marked" loss of range of motion on lateral rotation, increased paracervical and trapezial spasm to the left, and tenderness over the left AC joint (AR 502). No manual motor deficits were noted in his left upper extremity (AR 502). A cervical MRI dated June 30, 2009 revealed status post cervical fusion of the C5 through C7 levels (AR 482). There was also a resolution of the disc protrusion at C6-7, and a decrease in the size of the C5-6 disc bulge (AR 482).

On August 11, 2009, Dr. Macielak noted that Plaintiff's cervical MRI showed no significant changes (AR 501). Plaintiff exhibited positive Tinel's at the cubital tunnel, left greater than right, with limited left upper extremity strength in both external and internal rotation at the shoulder (AR 501). He was diagnosed with cubital tunnel syndrome,[2] left greater than right (AR 501). On August 17, 2009, Plaintiff reported recurrent neck pain at his office visit with Dr. Bazylak (AR 471). An electrophysiological evaluation of Plaintiff's upper extremities on August 19, 2009 was reported as normal (AR 465-468).

When seen by Dr. Macielak on September 1, 2009, he found that Plaintiff had positive Tinel's at the elbow (AR 500). He observed that Plaintiff's EMG study did not show any evidence of radiculopathy, neuropathy or peripheral entrapment, and that his MRI demonstrated that the cervical spine looked "structurally" appropriate (AR 500).

On September 26, 2009, Dr. Bazylak summarized his treatment of Plaintiff and rendered an opinion relative to Plaintiff's ability to work:

> David Vaughn … has been a patient of mine for many years. He has had a long history of chest pain and shortness of breath. He has also had a total revision for a torn tendon at the Cleveland Clinic. Also cervical degenerative disc disease with

---

[2] Cubital tunnel syndrome is compression or traction of the ulnar nerve at the elbow. *The Merck Manual*, 392 (19th ed. 2011).

radiculopathy. He has had his left shoulder replaced at the Cleveland Clinic. He has been on multiple pain medications for all the pain he has sustained secondary to his illness. He has also had a transposition of his pectoralis muscle at the Cleveland Clinic following his shoulder replacement. He continues to have pain in his shoulder and neck, as well as headaches. He was later tested and found to have herniated discs in his neck and had multiple epidural injections for this.

After numerous treatment modalities, he continued to have headaches and neck pain that have persisted until the present time. He had a cervical discectomy on 03-20-2009, but he continued to have pain. He has headaches that persist to this day. He also had other joint pains throughout the body that have not improved. His present medications include Azor, Seroquel, Hydroxyzine, Amitriptyline and Cymbalta.

He has limitations in movement of his neck, shoulder and arms. He also has shortness of breath and chest pain that persists. As a result of these numerous illnesses alone and in combination, I feel that Mr. Vaughn is totally disabled and cannot sustain any full time work with these impairments.

(AR 520).

On September 28, 2009, Dr. Macielak similarly detailed his treatment of Plaintiff and rendered his opinion with respect to Plaintiff's ability to work:

Mr. Vaughn is an active patient of my practice. He was referred by my associate, Dr. Paczkoskie for evaluation of cervical pathology.

Mr. Vaughn's condition is complex in that he has cervical shoulder girdle pain. He has been through an extensive reconstructive surgery both by Dr. Paczkoskie and at the Cleveland Clinic. He was initially seen by me on 8-24-07. He had been through an extensive course of non operative management including physical therapy, medications and epidural injections without relief.

Ultimately the patient underwent surgery on his neck. This was on 3-27-09, an anterior cervical discectomy decompression and fusion at the C5-6, 6-7 levels, placement of fibular allograft and anterior cervical plating.

Post surgically he made progress for some time, however, at his last office visit on 6-25-09 he had deteriorated. He was beginning to experience increased neck pain with radiation into the left shoulder girdle area. He was requiring medications.

On examination there was marked loss of range of motion of the cervical spine, especially for left lateral rotation. He had tenderness in the left AC joint. There were no manual motor deficits but there was altered range of motion of the left shoulder which had undergone a shoulder replacement by Dr. Iannotti at the Cleveland Clinic. He also had some hypesthesias ulnar nerve distribution left upper extremity. He cannot internally rotate his shoulder on the left due to his previous condition and surgery. External rotation is asymptomatic for him.

Plain Xrays of the cervical spine showed satisfactory graft, plate screw position.

It is my medical opinion within a reasonable degree of certainty that Mr. Vaughn is currently not capable of sustained gainful employment. The basis of that opinion is recovery from two level anterior cervical discectomy and fusion in the cervical spine as well as prosthetic placement in the left shoulder. Furthermore, based on his previous surgery, his cervical spine is permanently impaired with a loss of three functional levels and he has altered left shoulder function due to the placement of a prosthetic device. Furthermore, these impairments will be long standing or permanent so his prohibition against sustained gainful employment will be long standing or permanent.

(AR 522).

### B. Mental impairments

Records during the relevant time period show that Plaintiff was seen by Ayodeji Somefun, M.D. on October 19, 2007 (AR 245). Plaintiff reported that he was doing well and was working part time at a tool and die shop (AR 245). Dr. Somefun found Plaintiff was fully oriented, cooperative, and adequately groomed (AR 245). His speech was clear and coherent, his thoughts were logical, organized and goal directed, and he reported his mood as "fine" (AR 245). Plaintiff denied any suicidal thoughts, hallucinations or paranoia (AR 245). Dr. Somefun diagnosed him with major depressive disorder, recurrent; anxiety disorder, not otherwise specified; and rule out obsessive-compulsive personality traits (AR 245). He was continued on Cymbalta and Ambien (AR 245).

There were no changes noted by Dr. Somefun at Plaintiff's December 17, 2007 visit, but Plaintiff did note feeling "more depressed" (AR 244). On February 18, 2008, Plaintiff stated that he was "doing well" but noted some sleep difficulties, which he attributed to working second

shift (AR 243). He stated that he "spent a lot of time" at his job and with his church activities (AR 243). His mental status examination and diagnosis remained the same (AR 243).

Plaintiff was seen by Emmanuelle Duterte, M.D., on July 28, 2008 (AR 385-387). Plaintiff reported a history of major depressive disorder and anxiety disorder, and claimed that his medications no longer controlled his symptoms (AR 385). Plaintiff reported having suicidal thoughts the previous week (AR 385). He indicated that he felt better following medication changes (AR 385). He denied any current suicidal thoughts and denied any psychotic or manic symptoms (AR 386). Dr. Duterte reported that Plaintiff was fully oriented, appropriately dressed and well groomed (AR 386). He was pleasant and cooperative, and maintained good eye contact (AR 386). Dr. Duterte found Plaintiff did not appear to be depressed, and that his thought process was organized, logical and goal directed (AR 386). He found that his insight and judgment were "fair," and he noted that he displayed adequate impulse control, and his cognition was intact (AR 386). Dr. Duterte diagnosed Plaintiff with major depressive disorder, recurrent; anxiety disorder, not otherwise specified; and obsessive-compulsive personality disorder (AR 386). He was assigned a Global Assessment of Functioning ("GAF") score of "about" 51-60 (AR 386).[3]

Plaintiff returned to Dr. Duterte on August 5, 2008 and claimed that he was depressed, agitated and irritable, but denied having any suicidal thoughts (AR 383). Dr. Duterte found his insight and judgment were "fair" and his cognition was intact (AR 383). His diagnosis and GAF score remained the same (AR 383). At his August 20, 2008 visit he was assigned a GAF score of 55 (AR 459).

---

[3]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 51 to 60 may have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and coworkers)."

On September 4, 2008, Manella Link, Ph.D., a state agency reviewing psychologist, reviewed the psychiatric evidence of record and determined that Plaintiff had no limitations in completing activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (AR 419). Dr. Link completed a mental residual functional capacity assessment form, and found that Plaintiff was moderately limited in his ability to carry out detailed instructions, and maintain attention and concentration for extended periods (AR 406-407). He further found that Plaintiff was moderately limited with respect to his ability to complete activities within a schedule, maintain regular attendance, perform at a consistent pace without an unreasonable number of breaks, and respond appropriately to criticism from supervisors, and/or changes in the work setting (AR 406-407). Dr. Link also found that Plaintiff was either not limited or not significantly limited in all other work-related areas (AR 406-407).

Dr. Link found that the medical evidence established a medically determinable impairment of major depression, anxiety disorder, and obsessive compulsive disorder personality traits (AR 408). While she noted Plaintiff's frustration tolerance was low and he had a history of distractive behavior, she found there were no restrictions in his abilities with respect to understanding and memory (AR 408). She also found he would be able to make simple decisions and sustain an ordinary routine without special supervision (AR 408). Finally, Dr. Link concluded that Plaintiff remained capable of meeting the basic mental demands of competitive work on a sustained basis (AR 408).

On September 10, 2008, Plaintiff returned to Dr. Duterte and reported that he was doing better (AR 456). Dr. Duterte found Plaintiff's affect to be "bright" and he denied suicidal thoughts (AR 456). His diagnosis remained unchanged, and he was assessed a GAF score of 60 (AR 456). On October 8, 2008, Plaintiff reported increased financial stressors, but denied having suicidal thoughts (AR 454). Dr. Duterte assigned him a GAF score of 65 (AR 454).[4]

---

[4] An individual with a GAF score of 61 to 70 may have "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*.

On October 6, 2008, Plaintiff underwent a psychosocial evaluation at the Department of Comprehensive Pain Care upon referral by Dr. Duterte (AR 646-647). Plaintiff reported to Marilyn Cushard, MA, that he was depressed but was positive about his therapy (AR 647). He reported being a youth group leader at church for the past 10 years, and that he was "very involved" with his childrens' activities (AR 647).

On November 18, 2008, Plaintiff reported an improvement in his symptoms of depression (AR 452). He denied suicidal thoughts, and Dr. Duterte found him to be fully oriented, neatly groomed, and appropriately dressed (AR 452). He further found his thought process was logical, organized and goal-directed, his insight and judgment were "fair", his impulse control was adequate, and his cognition was intact (AR 452). He diagnosed Plaintiff with major depressive disorder, recurrent, anxiety disorder, not otherwise specified, and obsessive compulsive personality traits (AR 452). Dr. Duterte assigned him a GAF score of 65-70 (AR 452). On December 17, 2008, Plaintiff claimed he was struggling with depression and pain (AR 450). He reported that activities such as attending church youth group meetings helped improve his mood (AR 450). His diagnosis remained unchanged and he was assessed a GAF score of 70 (AR 450).

On January 5, 2009, Plaintiff reported that he noticed "a good bit of difference" following adjustments in his medications, and had a "fairly good" holiday with his family (AR 448). Dr. Duterte assigned him a GAF score of 70 (AR 448). His diagnosis remained the same and he was assigned a GAF score of 60 (AR 447).

Plaintiff returned to Dr. Duterte on March 4, 2009, and his diagnosis and GAF score remained the same (AR 445).

Plaintiff was seen by Kimberley Coddington, Ph.D. at the Mind-Body Wellness Center on March 26, 2009 upon referral by Dr. Duterte (AR 431-435). Plaintiff reported increased depression and anxiety, as well as "some level" of post-traumatic stress disorder symptoms related to an ice fishing accident in February 2009 (AR 431). Plaintiff claimed he had been disabled for six years due to degenerative joint disease (AR 431). He stated that he was trying to establish a business making fishing lures and turkey calls, and that he spent some of his time in a wood shop he had established in his home for such purpose (AR 433). Dr. Coddington found

that Plaintiff was well-kept, well-oriented, "very pleasant" and cooperative, and his thought processes were coherent, appropriate and goal oriented (AR 432). She also noted that his reasoning and judgment appeared to be "good" and he denied suicidal thoughts (AR 432; 434). She diagnosed him with major depression, recurrent, and anxiety disorder, not otherwise specified, and assigned him a GAF score of 60 (AR 434).

On April 13, 2009, Plaintiff was seen by Dr. Duterte and reported increased depression following his neck surgery but that he was "doing a lot better" (AR 443). His GAF was 65 (AR 443). On May 13, 2009, Plaintiff reported some deterioration in his mood after he ran out of his medications (AR 441). His diagnosis and GAF score remained the same (AR 441).

On June 12, 2009, Dr. Duterte assessed him with a GAF score of 65-70 (AR 440). Plaintiff reported increased depression at his August 3, 2009 visit, but denied suicidal thoughts and was assigned a GAF score of 60 (AR 436-437).

On September 29, 2009, Dr. Coddington completed a form entitled "Medical Impairment Questionnaire" and opined that Plaintiff had "marked" limitations in his activities of daily living, social functioning, and ability to maintain concentration, persistence or pace (AR 524). She further opined that Plaintiff had four or more episodes of decompensation since September 2008, each of at least two weeks duration (AR 524).

On October 15, 2009, Dr. Duterte reported that Plaintiff's mood had "not really been stabilized" and that he went through periods of depression where he was unable to perform "a lot of his daily activities" (AR 645). Dr. Duterte also reported that Plaintiff's medical problems affected his mood somewhat, and that while he had not had any recent suicidal thoughts, he continued to display symptoms of depression, anhedonia, poor sleep, and difficulties with activities of daily living (AR 645). Dr. Duterte concluded that Plaintiff was unable to "sustain any type of steady work" (AR 645).

*Administrative hearing*

Plaintiff, his wife, and Stephen Edwards, a vocational expert, testified at the hearing held by the ALJ on October 22, 2009 (AR 26-69). Plaintiff testified that he performed some part-time work in 2007 and 2008, but had not worked since his cervical surgery on March 27, 2009 (AR

32-34).  Plaintiff lived with his wife and two children (AR 36).  He testified that got out of bed around 8:30 or 9:00 a.m. and ate breakfast (AR 37).  Plaintiff indicated that he would either read or "tinker" in his wood shop making wooden pens, and walk the dogs (AR 37).  He napped in the afternoon until his daughter returned from school (AR 38).  Plaintiff claimed that making wooden pens was not a daily activity (AR 38).  He also claimed he could only stand for 30 to 40 minutes, lift 20 pounds with both hands, and drive 10-15 miles (AR 39-40).  Plaintiff claimed that he was able to help his wife with the groceries, but was unable to lift them and put them on the counter (AR 42).  Plaintiff testified that driving in traffic was difficult because of restricted mobility in his neck (AR 41).  He indicated that he was unable to fasten his seat belt with his left arm and had to close the door with his right arm due to decreased left arm strength (AR 41).  He claimed he replaced his truck with a smaller vehicle due to an inability to reach items in the cab and because he had trouble climbing in and out (AR 41-42).  He stated that he never missed a school function and read "a lot" with his son (AR 40).

Plaintiff testified to undergoing five left shoulder surgeries since April 2004 (AR 42-43).  He also claimed to have had right shoulder pain (AR 43).  He was unable to lift his left arm over his head, put his wallet in his back pocket, or tuck in the back of his shirt (AR 44).  Plaintiff further testified that following his March 2009 neck surgery his condition deteriorated, and he had recently begun treatment at a pain clinic (AR 45-46).  Plaintiff claimed he had decreased grip strength (AR 46).  He also claimed he had trouble buttoning his shirt, and was unable to wash his back or tie his shoes (AR 47-48).  Plaintiff stated that he had been a semi-professional archer, but could no longer shoot a compound bow (AR 48).  He also previously cooked but could no longer manipulate pots and pans (AR 48-49).  Plaintiff testified that he suffered from back and left leg pain, as well as daily headaches (AR49).  He claimed that his depression was such that it caused him to periodically "sit and stare at the wall" (AR 51-52).  He further claimed he had trouble remembering appointments and had difficulty getting along with others (AR 52-53).

Plaintiff's wife testified that he was in significant pain on a daily basis (AR 55).  She also claimed he had difficulty dressing, driving a car, lifting items and was depressed (AR 55-57).  In

that regard, she testified that Plaintiff spent a lot of time alone, did not socialize with friends, and had trouble getting along with people (AR 57-58).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform light work, in that he could lift and carry 10 pounds frequently and 20 pounds occasionally; sit for eight hours in an 8-hour workday; and walk or stand six hours in an 8-hour workday, but needed a sit/stand option (AR 64). Such individual could perform no overhead work, no pushing or pulling with the upper extremities, or frequent reaching overhead (AR 64). The vocational expert testified that such an individual could perform the light positions of an office helper and information clerk, and the sedentary positions of an order clerk and surveillance system monitor (AR 64).

Following the hearing, the ALJ issued a written decision finding that Plaintiff was not entitled to a period of disability or DIB within the meaning of the Act (AR 12-20). His request for an appeal with the Appeals Council was denied, rendering the ALJ's decision the final decision of the Commissioner (AR 1-6). He subsequently filed this action.

### III.    STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also*

*Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

## IV. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. 20 C.F.R. § 404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

The ALJ concluded that Plaintiff had the following severe impairments: "degenerative joint disease (DJD) and degenerative disc disease (s/p cervical fusion in March 2009)" but determined at step three that he did not meet a listing (AR 15-16). The ALJ found that he was

able to perform a limited range of light work, "except the [Plaintiff could] alternate sitting and standing for a few minutes at a time" (AR 16). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 19-20). The ALJ also found that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible (AR 17). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).[5]

Plaintiff first contends that the ALJ erred in concluding that his depression was not a severe impairment at step two of the evaluation process. *See* [ECF No. 9] pp. 9-13. Step two of the process "determines whether the claimant has a medically severe impairment or combination of impairments." *Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). According to the Commissioner's regulations, "an impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a); *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). Basic work activities are defined as "abilities and aptitudes necessary to do most jobs," including, *inter alia*, understanding, carrying out, and remembering simple job instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 1521(b)(3)-(6). "The step-two inquiry is a *de minimis* screening device to dispose of groundless

---

[5]Plaintiff has supplemented the record with a favorable decision dated September 29, 2011 by ALJ Alfred Costanzo finding him disabled effective November 4, 2009, one day after the ALJ's final decision at issue in this case. [ECF No. 13]. The Third Circuit has held, however, that "[s]tanding alone, the fact that the Commissioner subsequently found claimant to be disabled does not warrant remand or reversal in the absence of new and material evidence … ." *Jackson v. Astrue*, 402 Fed. Appx. 717, 718 (3d Cir. 2010), citing *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652-53 (6th Cir. 2009). As explained in *Allen*:

> A sentence six remand would be appropriate based on [the claimant's] subsequent favorable decision only if the subsequent decision was supported by new and material evidence that [the claimant] had good cause for not raising in the prior proceeding. It is [the claimant's] burden to make this showing under § 405 (g)[.]

*Allen*, 561 F.3d at 653. The claimant in *Allen* did not point to any evidence that was both new and material, and the court concluded he had not carried his burden under § 405(g). Nor has the Plaintiff in this case. Accordingly, we find that a sentence six remand is not dictated on the basis of this second decision.

claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). To show that an impairment is severe, however, a claimant must demonstrate "something beyond a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *McCrea*, 370 F.3d at 360 (quotation and citations omitted). The burden of showing that an impairment is severe rests with the claimant. *Bowen*, 482 U.S. 146 n.5.

The ALJ concluded that Plaintiff's depression did not have more than a minimal impact on his ability to perform basic mental work activities and therefore, it was not a severe impairment (AR 15). The ALJ found that Plaintiff had no difficulties with respect to his daily activities, observing that Plaintiff continued to work either full or part-time while undergoing mental health treatment (AR 15). He summarized Plaintiff's testimony regarding his extensive daily activities, including working in his wood shop, helping his child with homework, hunting three times per month, reading, and driving himself to appointments and his children to their activities (AR 15). He found Plaintiff only mildly limited socially, noting that he had a wonderful relationship with his family, visited with friends, participated in Church and was a youth group volunteer (AR 15). The ALJ also found Plaintiff had only mild limitations in the areas of concentration, persistence and pace (AR 15). He recognized that while Plaintiff claimed limitations in this area, therapy records from Dr. Somefun, Dr. Duterte and Dr. Coddington showed few problems in this area and that his cognition remained intact (AR 15). The ALJ further found there was no evidence of episodes of decompensation (AR 15). Finally, the ALJ observed that Dr. Link concluded Plaintiff's depression resulted in less than marked functional limitations (AR 16).

However, Dr. Duterte, Plaintiff's treating psychiatrist, reported the he continued to display symptoms of anhedonia, poor sleep, problems with his appetite, and difficulties with activities of daily living (AR 645). He opined that Plaintiff's mood instability precluded him from working, noting that he was on a "very high dose" of antidepressants (AR 645). Dr. Coddington, Plaintiff's treating psychologist, opined that Plaintiff had "marked" limitations in his activities of daily living, social functioning, and ability to maintain concentration, persistence

or pace (AR 524). In addition, Dr. Link, the state agency reviewing physician, found that Plaintiff's depression caused moderate limitations in a number of work related areas (AR 406-407).[6]

The above evidence, at a minimum, created "[r]easonable doubts" as to whether Plaintiff's depression caused more than a "slight abnormality" on his ability to work which should have been resolved in his favor. *Newell*, 347 F.3d at 547 ("Reasonable doubts on severity are to be resolved in favor of the claimant."); *see also Magwood v. Comm'r of Soc. Sec.*, 417 Fed. Appx. 130, 132 (3d Cir. 2008) (finding *de minimis* standard was "more than met" where claimant demonstrated she was receiving psychiatric services on a regular basis, was engaged in therapeutic counseling on a weekly basis, was taking antidepressants, was assessed as functioning with a GAF of 55-60, and had an opinion from a treating psychiatrist that she was unable to work on a sustained basis); *Fetters v. Astrue*, 2009 WL 632603 at *3 (W.D.Pa. 2009) (ALJ should have concluded that claimant's depression was a severe impairment under the regulations where consulting examiner and state agency psychologist indicated that claimant's depression resulted in more than minimal restrictions on claimant's ability to function in certain areas).

Any error in the step two determination may be rendered harmless, however, where an ALJ proceeds with the sequential evaluation process and considers the impact of all of a claimant's impairments in fashioning his or her residual functional capacity ("RFC"). *See, e.g., McCartney v. Comm'r of Soc. Sec.*, 2009 WL 1323578 at *16 (W.D.Pa. 2009) (error harmless where ALJ considered all of claimant's impairments in determining his residual functional capacity); *Kreuzberger v. Astrue*, 2008 WL 2370293 at *8 (W.D.Pa. 2008) (finding that even if ALJ had erroneously concluded that an impairment was not severe, error was harmless since ALJ found in claimant's favor at step two and proceeded with sequential analysis considering all claimant's impairments).

---

[6] Plaintiff cites to treatment records from Dr. Coddington dated September 9, 2010 in further support that his depression was a severe impairment. *See* Plaintiff's Brief pp. 11-12. This evidence however, was generated after the ALJ rendered his decision on November 3, 2009, and pursuant to *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001), we cannot consider this evidence in our review of the ALJ's decision.

Here, the ALJ's error at step two cannot be considered harmless since he did not consider all of the Plaintiff's impairments in making his RFC determination. In *Fetters v. Astrue*, 2009 WL 632603 at *4 (W.D.Pa. 2009), the court found that the ALJ erred in concluding that plaintiff's depression was not a severe impairment under the regulations. *Id*. The court further found, however, that any error was harmless because the ALJ incorporated limitations arising from the plaintiff's depression into his residual functional capacity assessment by limiting plaintiff to "simple, routine and repetitive tasks involving simple, work-related decisions." *Id*. Here, the ALJ did not factor any limitations relative to Plaintiff's depression into the RFC analysis or explain his reasons for declining to do so. "[T]he Commissioner's residual functional capacity assessment must still account for *all* of the claimant's impairments, including those which are found to be 'non-severe.'" *Holcomb v. Astrue*, 2008 WL 3539987 at *5 (W.D.Pa. 2008) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)). Because the ALJ failed to consider the Plaintiff's depression in assessing his RFC, the case will be remanded and the ALJ is directed to consider the functional limitations, if any, resulting from Plaintiff's depression.[7]

With respect to his physical impairments, Plaintiff argues that the ALJ improperly rejected the opinions of his treating physicians, Dr. Bazylak and Dr. Macielak. A treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). Even when a treating physician's opinion is not given controlling weight, it is entitled to "great weight, especially when [it] reflect[s] expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). In rejecting a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports" and may reject "a

---

[7] Plaintiff also challenges the ALJ's rejection of the opinions of Dr. Coddington and Dr. Duterte relative to his depression. The ALJ will necessarily re-examine these opinions in connection with his RFC assessment.

treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (holding that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence" not "simply by having the administrative law judge make a different judgment"); *Moffat v. Astrue*, 2010 WL 3896444 at *6 (W.D.Pa. 2010) ("It is axiomatic that the Commissioner cannot reject the opinion of a treating physician without specifically referring to contradictory medical evidence.").

Finally, in evaluating a claim for benefits, the ALJ must consider all the evidence in the case. *Plummer,* 186 F.3d at 429. The Third Circuit has also directed that "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence," *Dobrowolsky v. Califano*, 606 F.2 403, 407 (3d Cir. 1979), and "adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000). Without this type of explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705-07 (3d Cir. 1981); *see also Plummer*, 186 F.3d at 429 (ALJ must give some reason for discounting the evidence he rejects).

Dr. Bazylak and Dr. Macielak opined that Plaintiff's physical impairments precluded him from working (AR 520; 522). In assigning these opinions "little weight", the ALJ stated:

> In sum, the evidence does not support the degree of limitation alleged. In making this finding, the undersigned considered the medical source statements from Doctor's (*sic*) Bazylak and Macielak finding the claimant's impairments, in combination, are disabling. However, the undersigned gives these opinions little weight because they are not consistent with the treatment notes for these doctor's (*sic*) or the record as a whole. …

(AR 18). Plaintiff argues that the ALJ's rejection of the treating physicians' opinions was unduly conclusory in contravention of the previously described case law. However, the ALJ did, in the Court's view, adequately address the basis for rejecting those opinions, stating:

> The claimant is a right hand dominant individual who has had several surgeries to repair a left rotator cuff tear. He has had physical therapy, steroid injections and

medication to control his pain, but his (*sic*) still complaints of limitations and pain from his left shoulder. He also complains of right shoulder pain, but the evidence shows good pain improvement with hyalgan injections and physical therapy for right shoulder pain and movement. (Exhibits B6F and B10F).

The evidence of record does not support the limitation alleged. March 2008 X-rays, including AP, lateral, and auxiliary views, demonstrate a well-seated left shoulder replacement (Exhibit B8F). August 2008 notes indicate that the claimant had a moderate decrease in pain in his shoulder through physical therapy (Exhibit B10F). An electrophysiologic evaluation of the claimant's upper extremities was normal (Exhibit B21F). Finally, Dr. Paczkoskie, who performed several left shoulder surgeries, determined on January 29, 2009 that the claimant could return to light or sedentary work (Exhibit 23F).

Further, although the claimant recently had a cervical discectomy and fusion at C5-6 and C6-7, the objective testing consistently indicates mild compression of the thecal sac and minimal spinal stenosis (Exhibits B8F, B9F, B10F, B14F). Even though his objective testing indicated mild symptoms, the claimant continued to have pain and some headaches (relieved with epidurals). In March 2009, Dr. James Macielak performed a disectomy and fusion (Exhibit B22F). The claimant indicated some improvement until June 2009, when he reported a return of symptoms. Even so, Dr. Macielak's review of a September EMG study indicated the claimant was negative for radiculopathy, neuropathy and peripheral entrapment and he reported that a MRI of the claimant's cervical spine at that time indicated that everything looked appropriate (Exhibit B24F).

(AR 18).

Moreover, the ALJ properly considered non-medical evidence in rejecting those opinions. The ALJ noted that Plaintiff's wife testified he was able to hunt three times per week for two hours using a cross bow, and was an active participant in church activities (AR 18). The ALJ further observed that Plaintiff continued to work through 2008 and into the first quarter of 2009, right before his neck surgery, and informed Dr. Coddington that he worked in his wood workshop on a daily basis (AR 18). In sum, the ALJ's rejection of the opinions of Dr. Bazylak and Dr. Macilak is supported by substantial evidence.

21

**V.     CONCLUSION**

For the reasons discussed above, both Motions will be denied and the matter will be remanded to the Commissioner for further proceedings.[8]   An appropriate Order follows.

---

[8] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issue addressed in this Memorandum Opinion.  *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3d Cir. 2010).

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DAVID VAUGHN,               )
                            )
               Plaintiff,       )        Civil Action No. 11-82 Erie
                            )
      v.                     )
                            )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,   )
                            )
             Defendant.    )

## <u>ORDER</u>

      AND NOW, this 10th day of August, 2012, and for the reasons set forth in the accompanying Memorandum Opinion,

      IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [ECF No. 8] is DENIED, and the Defendant's Motion for Summary Judgment [ECF No. 10] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

      The clerk is directed to mark the case closed.

                                 s/ Sean J. McLaughlin
                                  United States District Judge

cm:    All parties of record